UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:18–CR–140 |
| | ) | |
| PETER BOLOS | ) | |

MEMORANDUM OPINION AND ORDER

On April 8, 2022, the United States Probation Office filed a Presentence Investigation Report ("PSR") in this case. [Doc. 741]. The United States and Defendant Bolos, through counsel, filed objections to the PSR. [Docs. 770–71]. The United States Probation Office filed an addendum to the PSR addressing the Parties' objections. [Doc. 826]. The Court previously ruled on these objections at Defendant's sentencing hearing, and this order supplements those rulings.

I.  Background

On December 1, 2020, a grand jury returned a first superseding indictment charging Defendant Bolos with conspiracy to commit health care fraud, 18 U.S.C. § 1349, mail fraud, 18 U.S.C. § 1341, and violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331(a), 353(b)(1), and 333(a)(2). [*See generally* Doc. 278]. After a trial, a jury returned a verdict finding Defendant Bolos guilty of one count of health care fraud, twenty-two counts of mail fraud, and one count of felony misbranding under the Food, Drug, and Cosmetic Act. [Doc. 663]. On May 16, 2022, the Court sentenced Defendant Bolos to a 168–month term of incarceration. [Doc. 871].

1

## II. Objections

As previously mentioned, the Court already ruled on all of the Parties' objections. The Court will briefly address Defendant Bolos's objections that affect his guideline range. The Court will address them in the order that they appear in the PSR Addendum.

1. <u>Defense Objection Seven</u>

In his seventh objection, Defendant Bolos objects to Paragraphs 31 and 44 of the PSR. [Doc. 771, PageID 11587, 11594; Doc. 826, PageID 14109]. Paragraph 31 of the PSR states, "According to the United States Attorney's Office, the loss to the government health care programs was more than $1,000,000, but less than $7,000,000." [Doc. 741, PageID 11423]. Paragraph 44 applies a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(7) for the loss to government health care programs. [*Id.* at PageID 11424]. This Guidelines section provides, "If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels . . . ." U.S.S.G. § 2B1.1(b)(7)(i).

Defendant objects to the application of this two-level enhancement arguing that insufficient evidence supports finding that government healthcare programs lost more than $1,000,000.00, and "Synergy and Precision did not process prescriptions for governmental payors." [Doc. 771, PageID 11587]. The United States agrees that the two-level enhancement should be removed because "the scheme here was designed to exclude government payors." [Doc. 788, PageID 13527].

Although the Parties agree, Scott Roix's plea agreement states, "S-Pharmacy [Synergy] received approximately $1,027,975 from Medicare, $426,929 from TRICARE, $1,021,161 from various state Medicaid programs . . . $828,297 from FEHBP, and approximately $108,582 from FECA . . . ." [Plea Agreement, Doc. 4, PageID 42–43, *United States v. Scott Roix*, 2:18–CR–133

2

(E.D. Tenn. 2018)]. In spite of this evidence in the record, the objection is sustained given the positions of the Parties.

2. Defense Objection Nine

In objection nine, Defendant Bolos objects to paragraphs 33 and 42 of the PSR. [Doc. 771, PageID 11588; Doc. 826, PageID 14109–10]. Paragraphs 33 and 42 of the PSR discuss the methodology for calculating loss. [Doc. 741, PageID 11423–24]. The PSR calculates the actual loss in Defendant's case at $73,943,708.00. [*Id.*]. Turning to the Guidelines' loss chart, because the loss was more than $65,000,000 but less than $150,000,000, a 24–level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(1).

When determining loss, a court is to use "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The Parties agree that actual loss is more appropriate than intended loss. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)(i). Whereas "'[p]ecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." *Id.* at cmt. n.3(A)(iii). A comment also provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *Id.* at cmt. n.3(B). Under any of these methods, the Court only needs to make a "reasonable estimate of the loss," which is a "modest requirement . . . ." *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018). Here, the actual loss can be reasonably determined.

In calculating actual loss in this case, two categories of numbers are at issue. The first category is the amount of money paid by PBMs to Synergy and Precision for HealthRight prescriptions. The second category is the amount of clawbacks from PBMs.

As to the first category, four numbers are being offered. Plea agreements from Bolos's partners and co-conspirators state that the amount of loss was $73,943,708. [Doc. 311, PageID

3

4289; Doc. 313, PageID 4305]. At trial, Andrew Assad testified that Synergy and Precision received about $80 million from HealthRight prescriptions. [Doc. 713, PageID 10138]. Also at trial, Defendant Bolos said that PBMs paid the pharmacies around $90 million. [Doc. 775, PageID 11863]. However, in his objection to the PSR and sentencing memorandum, Defendant Bolos calculated $69,585,972.00 as the amount of loss. [Doc. 771, PageID 11588]. Using any of these calculations, the 24–level enhancement of the U.S.S.G. § 2B1.1(b)(1) applies.

Next, Defendant Bolos argues that the amount of loss, whatever it is, should be reduced based on clawbacks by the PBMs. Defendant Bolos contends that $10,585,390.00 should be offset, making the total loss $59,000,582.00. [Doc. 825, PageID 14043–44]. The only document submitted to the Court in support of his argument is an email between Defendant's wife and an accountant. [Doc. 825-1]. The information provided, in its entirety, reads:

> Meriam G: How much did we adjust the AR for in 2016 for the uncollected receivables/clawbacks
>
> Kim N, CPA: On the amended Synergy return that we did recently, the change in A/R from the originally filed return vs. the amended return was a decrease $10,585,390.

[*Id.*].

Defendant Bolos provided no testimony or other evidence to explain how the roughly $10 million in adjusted accounts receivable on an amended tax return is based entirely on clawbacks, especially considering he previously stated that all clawbacks were taken from future payments. [Doc. 771, PageID 11588–89]. Numerous factors could have caused the accounts receivable adjustment, including unpaid co-pays. Further, Defendant provided no case law for why the reduction should be applied under an actual loss calculation. Considering the email is the only offered evidence of clawbacks, the Court will not offset any loss amount.

4

As previously mentioned, Defendant made an argument that his profit should be used to calculate loss. Part of Defendant's argument is that only illegitimate claims should be used to calculate loss, and the Government has not provided evidence of which individual claims were fraudulent. Particularly, at oral argument, Defendant argued that patients received legitimate medical treatment, that is patients with pain received pain medicine. However, the fraud in this case was pervasive. The fraud extended beyond whether patients wanted the products or whether there was a legitimate-doctor patient relationship, which there was not. Defendant created sham marketing agreements, purchased prescriptions and patients' information (if they had private insurance), created a co-payment scheme, fraudulently obtained state pharmacy licenses, and the prescriptions were written without a legitimate doctor-patient relationship. The United States has provided an abundance of evidence showing that all of the HealthRight prescriptions were fraudulent and should be used to calculate actual loss.

Given that the Parties agree that the actual loss was above $65 million, and the Court will not reduce the loss by the alleged clawbacks, the objection to the PSR is overruled.

3. <u>Defense Objection Ten</u>

Next, Defendant objects to paragraphs 37 and 49 of the PSR. [Doc. 771, PageID 11588, 11596; Doc. 826, PageID 14110]. Paragraphs 37 and 49 applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. [Doc. 741, PageID 11424–25]. Sentencing Guideline § 3C1.1. provides, "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

5

The United States offers two grounds for supporting this enhancement, perjury and misleading his probation officer during supervision. [Doc. 788, PageID 13534].

To apply the obstruction of justice enhancement for perjury, a court must determine by a preponderance of the evidence that a defendant perjured himself. *United States v. Sierra-Villegas*, 774 F.3d 1093, 1102–03 (6th Cir. 2014). The guideline enhancement "rel[ies] upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621." *United States v. Dunnigan*, 507 U.S. 87, 94–96 (1993). "A witness testifying under oath or affirmation violates this statute if []he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* When a defendant objects to a sentence enhancement for perjury, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." *Id.*

The United States argues that "defendant testified that he was not paying HealthRight $500 per intake and that his agreement with HealthRight was not based on value or volume." [Doc. 788, PageID 13535]. However, the Government did not provide a citation to the record for this testimony for the Court's review. Therefore, the Court will not overrule the objection based on this argument.

Additionally, the Government cites Defendant's testimony about the role of test billing and when he learned certain aspects of the conspiracy, such as, licensing requirements. [*Id.* at PageID 13535–36]. While the Court agrees that the cited testimony may have been inaccurate, the testimony does not appear to be a "willful intent to provide false testimony . . . . " *Dunnigan*, 507

U.S. at 94–96. Instead, the testimony could have been Defendant Bolos's faulty recollection while on the stand, and he may have provided one reason for test billing, if not all of the reasons.

Turning to Defendant's statements to his probation officer, the Court has previously found those statements to be "directly contradictory . . . . " [Doc. 705, PageID 8857]. Although those statements were contradictory, the Court cannot find based on the record that Defendant Bolos willfully intended to provide false statements. Previously, the Court discussed those contradictions in the context of a motion for detention. While Defendant's statements supported a determination that he should be detained, the same cannot be said that they support a finding that he willfully intended to provide false statements.

Therefore, Defendant's tenth objection is sustained.

4. <u>Defense Objection Eleven</u>

Next, in objection eleven, Defendant objects to paragraph 43 of the PSR. [Doc. 771, PageID 11592; Doc. 826, PageID 1411]. Paragraph 43 of the PSR applies a two-level enhancement because "[t]he offense involved 10 or more victims and it was committed through mass-marketing. Thus, a two-level increase is applied. U.S.S.G. [§ 2]B1.1(b)(2)(A)." U.S.S.G. § 2B1.1(b)(2)(A) applies a two-level enhancement "[i]f the offense—(A)(i) involved 10 or more victims; [or] (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims . . . . "

The enhancement should apply as there are ten or more victims in this case, as conceded by Defendant Bolos, and, alternatively, this offense was committed through mass-marketing.

The enhancement for mass-marketing requires some analysis. According to the Guidelines commentary, the definition of mass-marketing is "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or

7

(iii) invest for financial profit." U.S.S.G. § 2B1.1(b)(2) cmt. n.4(A). Importantly, under the Guidelines, relevant conduct and offense conduct include:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
> (i) within the scope of the jointly undertaken criminal activity,
> (ii) in furtherance of that criminal activity, and
> (iii) reasonably foreseeable in connection with that criminal activity;
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense
> . . . .

U.S.S.G. § 1B1.3(a)(1)

Defendant Bolos argues that this enhancement should not apply in his case because HealthRight's marketing was directed towards patients, not the victim PBMs. In order for the enhancement to apply, according to Defendant, the mass-marketing must be directed towards victims.

Defendant has strong support for this position. Currently a circuit split exists on the issue, and the Sixth Circuit has remained silent on the matter, stating only that it is "a novel question . . . ." *United States v. Roberts*, 919 F.3d 980, 989 (6th Cir. 2019). The Second and Eighth Circuits agree with Defendant Bolos and say that mass marketing must be directed towards the victims for the enhancement to apply. *United States v. Lacey*, 699 F.3d 710, 712 (2d Cir. 2012); *United States v. Miller*, 588 F.3d 560, 562 (8th Cir. 2009).

The Second Circuit addressed the enhancement in *United States vs. Lacey*. In *Lacey*, a business created a scheme where it repeatedly "purchased . . . property at a favorable price in a 'short sale' from a financially distressed homeowner by negotiating with the homeowner's mortgage lender. The defendants then typically resold ('flipped') the property at a higher price to

a 'straw buyer' who had no intention of actually living at the property or making all of the loan payments." *Lacey*, 699 F.3d at 712. To ensure they had enough straw buyers, the defendants used "extensive radio advertisements . . . . " *Id.* at 713. These radio advertisements promised payments to the straw buyers when they purchased homes, and some straw buyers received payments. *Id.* After people responded to the ads, "employees worked with straw buyers to submit false mortgage applications and documentation in order to make it more likely that loans would be approved." *Id.* After receiving loans, the company would make "a few payments on the straw buyer's behalf so that the loan did not immediately go into default . . . . " *Id.* Then, they would stop making payments, go into default, and the bank would foreclose. *Id.* Defendants were found guilty of conspiracy to commit bank and wire fraud and substantive bank and wire fraud. *Id.* At sentencing, the district court applied the mass-marketing enhancement. *Id.*

On appeal, the Second Circuit vacated the sentences. *Id.* at 721. The Second Circuit held, "that the mass-marketing enhancement is properly applied only when the targets of the mass-marketing are also in some way victims of the scheme." *Id.* at 714. The circuit court said, "It is not enough that a scheme may be *advanced by* the use of mass marketing techniques; a scheme is *committed through* mass-marketing only when the mass marketing is directed toward individuals who will be harmed by the scheme." *Id.* at 714–15. The court determined this based on the other subsections of § 2B1.1(b)(2). *Id.* at 715. According to the Second Circuit, those subsections suggested that "the enhancement scheme is designed to measure the scope of the wrong by the number of victims, and that the use of mass-marketing is relevant even when the number of *actual* victims is small, because fraudulent mass-marketing creates a large number of *potential* victims." *Id.* at 715. The court went on to say that the enhancement could apply if the district court determined that the straw buyers were also victims. *Id.* at 717.

9

Likewise, in the Eighth Circuit, victims of the fraud must be the target of mass-marketing. In *United States v. Miller*, the defendants sent "fraudulent loan documents to a number of lending institutions." *United States v. Miller*, 588 F.3d 560, 562 (8th Cir. 2009). The documents contained false information regarding, among other things, "the appraised value of the subject properties, qualifications of the borrowers, and the state of the title." *Id.* In some portion of defendant's business, he used television commercials. *Id.* at 568. Virtually no information about the television commercials is given except that they were aimed at consumers, not financial institutions. *Id.*

In that case, the district court did not apply the enhancement. *Id.* The Eighth Circuit affirmed on appeal, simply stating, "The language of the enhancement clearly states that the offense itself must involve mass-marketing in order for the enhancement to apply. [The defendant] participated in a mortgage fraud conspiracy involving fraud on financial institutions, not consumers, thus, we find no error in the district court's analysis." *Id.* at 568 (internal citation omitted).

Contrary to those Circuits, the Fifth and Eleventh Circuits applied the enhancement when mass marketing was used during the commission of an offense, even if directed towards third parties. *United States v. Moran*, 778 F.3d 942, 956 (11th Cir. 2015); *United States v. Isiwele*, 635 F.3d 196, 198 (5th Cir. 2011).

In the Fifth Circuit case, *United States v. Isiwele*, the defendant hired a recruiter "to go into elderly and low-income communities and gather billing information from Medicare/Medicaid beneficiaries." 635 F.3d at 198. The recruiter's efforts were part of a health care fraud scheme to bill Medicare and Medicaid for unneeded electric wheelchairs. *Id.* After a jury returned a guilty verdict, the district court applied the mass-marketing enhancement as in-person solicitation can qualify as mass-marketing in the Fifth Circuit. *Id.* at 198, 204. The Fifth Circuit acknowledged the

10

victims of the crime were Medicare and Medicaid. *Id.* at 204. Then, the court looked at definitions under the Guidelines to determine that marketing efforts were relevant conduct and therefore part of the offense as defined by the Guidelines. *Id.* at 204–05.

Likewise, in the Eleventh Circuit, the court applied the enhancement in a health care fraud case. Among other charges, the defendants in that case were charged with "conspiracy to receive and pay health care kickbacks to recruiters to induce referrals of patients in connection with a federal health care program . . . . " *United States v. Moran*, 778 F.3d 942, 956 (11th Cir. 2015). The recruiters would refer Medicare beneficiaries to participate in unnecessary programs. *Id.* at 951. The district court applied the mass-marketing enhancement to some conspirators, and they appealed. *Id.* at 975. On appeal, they argued that "the mass-marketing targeting Medicare beneficiaries was incidental to the fraud in this case and that the increase does not apply when the true victim of the offense is the United States." *Id.*

After reviewing the Guidelines and the definitions in the Guidelines, the Eleventh Circuit agreed with the district court. *Id.* at 976. The circuit court held, "Patient recruiters engaged in mass-marketing in this case by targeting Medicare beneficiaries and bringing them" to participate in treatments. *Id.* The particular defendants addressed by the court "did not personally recruit patients for the clinic, [but] they were substantially involved in the recruitment efforts." *Id.* In sum, the Eleventh Circuit did not limit the mass-marketing to cases when victims were targets of mass-marketing.

Looking to the text of the Guideline, the Fifth and Eleventh Circuits have the better approach, and the enhancement applies in this case. The Guideline applies the enhancement when an offense is committed through mass-marketing. The largest limitation of this enhancement is found in the definition of mass-marketing. It defines mass-marketing as "a plan, program,

11

promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." No limitations based on the victims exists in the Guideline. While the Second Circuit approach focuses on the enhancement's other sections which involve the victims of the offense, the subsection regarding mass-marketing contains no reference to victims and only references the offense itself. Further, the Second Circuit's reasoning that the enhancement for mass-marketing considers *potential* victims in an otherwise unsuccessful mass-marketing scheme goes against the text of the Guideline.

Applying that standard to this case, the enhancement unquestionably applies. The definition of mass-marketing is met because HealthRight designed ads and used telemarketing to conduct campaigns "to induce a large number of persons to purchase goods or services . . . ." HealthRight patients were induced, whether they wanted them or not, to purchase prescription medications. These patients were billed for co-pays, were sent goods from the pharmacies, and then their insurances were billed for the medication. Additionally, this health care fraud offense was committed through mass-marketing. Without the mass-marketing, the scheme would not have worked. The basis of the scheme was the volume of prescriptions that could be billed based on the volume of patients that HealthRight could find through its internet advertisements.

Additionally, it is important to remember the purpose of the mass-marketing in this case. Even though the mass-marketing was directed at patients, the operation's targets were the PBMs. The mass-marketing was a crucial piece in the fraud directed to PBMs.

Because the offense involved ten or more victims and mass-marketing, Defendant's eleventh objection is overruled.

5. Defense Objection Twelve

Next, Defendant Bolos objects to paragraph 45 of the PSR. [Doc. 771, PageID 11594; Doc. 826, PageID 14111]. Paragraph 45 of the PSR added a two-level enhancement for the use of sophisticated means. [Doc. 741, PageID 11424–25]. The applicable Guideline states, "If . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels . . . ." U.S.S.G. § 2B1.1(b)(10)(C). In the comments, the definition of "sophisticated means" is "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(10) cmt. n.9(B). District courts look to "the totality of the defendant's conduct," not "individual steps" in the scheme. *United States v. Griffith*, 663 F. App'x 446, 453 (6th Cir. 2016) (quoting *United States v. Masters*, 216 F. App'x 524, 526 (6th Cir. 2007)). Even if the individual steps of a scheme are not complex, a scheme, overall, may still be sophisticated. *Id.* (quoting *United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013)). The use of shell companies and false documents justify the enhancement. *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018). Similarly, the coordination between two companies can justify the enhancement. *Id.*

Defendant Bolos argues that "he engaged in a marketing agreement with a telemedicine company and filled prescriptions issued by prescribers—there is nothing sophisticated about this." [Doc. 771, PageID 11594–95]. But that was only one step in the process. Defendant took multiple steps to ensure the scheme continued, and those steps were complex and intricate. He recruited R.S. to create Global Patient Services, created sham contracts with Global Patient Services and HealthRight, created the prescription cascade to maximize profitability, coordinated the efforts with HealthRight, reviewed call scripts to ensure that they elicited the proper responses from

13

patients, coordinated test billing to find profitable medications, and created other companies to ensure the scheme continued once PBMs began terminating Synergy. Even if these individual steps were simple, which not all of them were, they created a complex scheme under the Guidelines, and the sophisticated means enhancement applies. Therefore, Defendant's objection is overruled.

6. Defense Objection Thirteen

Next, Defendant Bolos objects to paragraph 47 of the PSR. [Doc. 771, PageID 11595; Doc. 826, PageID 14112]. Paragraph 47 of the PSR applies a four-level enhancement under U.S.S.G. § 3B1.1(a). [Doc. 741, PageID 11424]. This Guidelines section states, "Based on the defendant's role in the offense, increase the offense level as follows: (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a)

The enhancement has two parts, first, that the "defendant was an organizer or leader," and second, the "criminal activity . . . involved five or more participants or was otherwise extensive . . . . " U.S.S.G. § 3B1.1(a). When determining if a defendant was an organizer or leader, a court should evaluate seven factors:

> 1) exercise of decision-making authority,
> 2) the nature of participation in the commission of the offense,
> 3) the recruitment of accomplices,
> 4) the claimed right to a larger share of the fruits of the crime,
> 5) the degree of participation in planning or organizing the offense,
> 6) the nature and scope of the illegal activity, and
> 7) the degree of control and authority exercised over others.

*United States v. Morales-Martinez*, 545 F. App'x 495, 497–98 (6th Cir. 2013); *see United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

Not only must a defendant be an organizer or leader, but a defendant must also be "a manager or supervisor of at least one other participant in the criminal activity . . . . " *United States v. Moncivais*, 492 F.3d 652, 661 (6th Cir. 2007) (quoting *United States v. Henley*, 360 F.3d 509,

14

517 (6th Cir. 2004)). Under this inquiry, "a 'participant' is 'a person who is criminally responsible for the commission of the offense[] but need not have been convicted.'" *Id.* (quoting *Henley*, 360 F.3d at 517).

After determining a defendant's authority in the scheme, a court must look at the scheme itself. For the enhancement to apply, "the criminal activity [must have] involved five or more participants or was otherwise extensive." *Id.* A Court must look at "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *United States v. Anthony*, 280 F.3d 694, 701 (6th Cir. 2002). While looking at those factors, "the court must consider whether the combination of knowing participants and countable non-participants is the functional equivalent of an activity carried out by five criminally responsible participants." *Id.*

In this case, Defendant Bolos objects to the enhancement, stating, "Probation does not state who the defendant was a 'leader or organizer' for and their role in the offense. Peter Bolos was one of several equal partners in Synergy and Precision. If probation is suggesting that the enhancement applies to these individuals—that is factually incorrect. Peter Bolos did not lead, manage, recruit, or hire them." [Doc. 771, PageID 11595].

Contrary to Defendant's position, the Government argues that Defendant was a leader and the scheme included at least five participants.

The Government is correct here. Applying the leadership-factor test, all factors weigh in favor of applying the enhancement, with the exception of one. As to the first and second factors, Defendant was the managing partner of Synergy, owned an ownership share, was in charge of the relationship with HealthRight, and negotiated contracts with Scott Roix. Regarding the third factor,

15

Defendant recruited people into the scheme, including his cousin, Maikel Bolos, and a friend, R.S. The fourth factor is neutral. While Defendant Bolos received fruits of the crime, whether his share was "larger" than the other co-defendants is not clear. As to the fifth factor, Defendant played a major role in planning and organizing as he was in charge of the HealthRight relationship, negotiated contracts, organized Global Patient Services, participated in partner meetings, created the prescription cascade, and more. Sixth, the nature and scope of the activity was large and pervasive. The scheme, in its entirety, resulted in over $65 million of fraudulent payments. And last, the seventh factor, Defendant had significant control and authority of others. He was the managing partner of the pharmacies and direct supervisor of P.G. Again, he selected the medications on the prescription cascade. Additionally, he even had influence over HealthRight as he edited and approved the call sheets that HealthRight employees used on the phones. Importantly, he managed and supervised at least one participant, Maikel Bolos. Defendant recruited Maikel Bolos into the scheme and told him which states' pharmacist licenses he should obtain. Defendant Bolos also directed the activities of Scott Roix by telling him which prescriptions to obtain.

Moving to the second part of the enhancement, the scheme had at least five participants and was otherwise complex. Nine participants in the scheme included Maikel Bolos, Scott Roix, Andrew Assad, Michael Palso, Larry Smith, Mihir Teneja, Arun Kapoor, J.D., and Peter Bolos himself. Additionally, the scheme included numerous non-participants, including B.B., P.G., D.T., and C.P. All of these people performed essential functions in the conspiracy. Without them, this scheme would not have worked. Therefore, the scheme had the functional equivalent of at least five participants, and Defendant Bolos directed at least one participant, Maikel Bolos.

For those reasons, Defendant Bolos was an organizer or leader, and the objection is overruled.

7. Defense Objection Fourteen

The last objection to be addressed in this opinion is objection fourteen. [Doc. 826, PageID 14113]. In this objection, Defendant Bolos objects to paragraph 48 of the PSR. [Doc. 771, PageID 11595]. Paragraph 48 applies a two-level enhancement because "[t]he defendant abused a position of public or private trust . . . ." [Doc. 741, PageID 11425]. Because Defendant Bolos received an aggravating role enhancement, this enhancement may only be applied "based upon an abuse of a position of trust . . . ." U.S.S.G. § 3B1. People in positions of trust "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." U.S.S.G. 3B1.3 cmt. n.1. The Sixth Circuit has held that professionals who submit claims to private insurance companies occupy a position of trust. *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018) (citing *United States v. Hodge,* 259 F.3d 549, 556 (6th Cir. 2001)).

In his objection, Defendant argues that this objection does not apply because the insurance companies harmed in this case were private entities, not public. [Doc. 771, PageID 11595]. Contradicting Defendant's point is the text of the guideline stating that the enhancement applies when a defendant abused private trust. The Sixth Circuit has also applied this enhancement when a defendant abused private trust. *Bertram*, 900 F.3d at 753.

This enhancement applies in this case. While Defendant did not physically type in the claims to be submitted to PBMs, he occupied a position of trust as managing partner and part-

17

owner of a pharmacy. He used that relationship with insurance companies to implement this scheme. As part of that relationship, while he did not prescribe medication, he selected the medications that would be available to patients and arranged them by profitability. Even if he did not type the claims into the computer, his actions were crucial in the process of receiving prescriptions for particular medications, and those actions took advantage of the PBMs' trust. Additionally, Defendant was the moving force and signatory behind Synergy's application for a Tennessee pharmacy license, which was granted based on his misrepresentations. Then, he abused his position of trust as a license holder by facilitating the transportation of fraudulently obtained prescriptions to Tennessee. In both instances, his credentials as a managing partner and co-owner of a pharmacy, along with agreements with PBMs and sworn statements to the State of Tennessee, permitted him to abuse private and public trust.

Therefore, the objection is overruled.

### III. Conclusion

For the reasons stated above and at Defendant's sentencing hearing, the Court rules as follows:

- Defense Objection Seven is SUSTAINED;
- Defense Objection Nine is OVERRULED;
- Defense Objection Ten is SUSTAINED;
- Defense Objection Eleven is OVERRULED;
- Defense Objection Twelve is OVERRULED;
- Defense Objection Thirteen is OVERRULED;
- Defense Objection Fourteen is OVERRULED.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE